## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH W. MAGNANT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-0135 |
| | § | |
| PANELMATIC TEXAS, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Plaintiff Kenneth W. Magnant sued his former employer, Panelmatic Texas, Inc., alleging unlawful discrimination on the basis of disability and age, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA), and the Age Discrimination Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (ADEA). Panelmatic moved for summary judgment on both claims. (Docket Entry No. 16). Magnant responded, (Docket Entry No. 22), Panelmatic replied, (Docket Entry No. 23), and Magnant surreplied, (Docket Entry No. 24).

Based on the pleadings, the motion, response, reply, and surreply, the parties' submissions, the record, and the applicable law, this court grants Panelmatic's summary judgment motion and, by separate order, enters final judgment. The reasons for this decision are explained below.

## I.    Background

Panelmatic is in the business of building process control panels for the petrochemical

industry.  (Docket Entry No. 17, Ex. B at 11).   Magnant worked for Panelmatic as a technician, or wireman, beginning in 1995 on a contract basis and from 1996 to April 2004 on a full-time basis.  During the time Magnant worked for Panelmatic, he had a number of health problems.  When he was hired, he weighed 450 pounds.  Magnant had long-standing problems with his knees, including a lack of cartilage and severe arthritis, which prevented him from kneeling.  (Docket Entry No. 17, Ex. A at 9).   In 2002, Magnant had a heart catheterization for which he took medical leave.  (*Id.* at 17).   In September 2003, he had a quadruple bypass.  (*Id.* at 8–9; Docket Entry No. 1, ¶ 5).  He returned to work on December 15, 2003 with restrictions.  The summary judgment record includes a copy of a "Return to Work" note from Magnant's doctor, Eve L. Patton, dated December 18, 2003.  (Docket Entry No. 17, Ex. A).  The note states that Magnant was restricted from "lifting greater than 20 lbs. [or] walking greater than 75 yds."  (*Id.*).  Magnant testified that he could not lift more than 25 pounds, could stand "[h]alf an hour or so at a time; maybe an hour," and could walk from 50 to 75 yards.  (Docket Entry No. 17, Ex. A at 66).  These medical restrictions were expected to be temporary, but were permanent. (*Id.* at 43).

Magnant's obesity contributed to the restrictions on his activities.  (Docket Entry No. 17, Ex. A at 19).  In his complaint, Magnant alleged that his obesity also "affects his ability to lift heavy items."  (Docket Entry No. 1, ¶ 5).  Magnant testified, however, that while his knee problems and obesity presented difficulties, "[i]t was the open-heart surgery, basically that finished [him]."  (Docket Entry No. 17, Ex. A at 9).

In April 2004, Richard Leach, the general manager of the Houston Panelmatic office, decided to lay Magnant off for what was expected to be three or four weeks because the company did not have work available that Magnant could do on a full-time basis. Leach did not call Magnant to return to work. (Docket Entry No. 17, Ex. B at 47–49). In this lawsuit, Magnant alleges Panelmatic fired him because of age and disability discrimination. Leach testified in his deposition that he laid Magnant off and did not call him back to work because the company did not have enough full-time work that he could do, given his physical limitations. (*Id.* at 40).

Leach and Magnant consistently described how Panelmatic's business changed from 1996, when Magnant began working full-time, to 2004, when he was discharged. Panelmatic's business of building process control panels fell into two categories. One category involved placing large electronic control panels into even larger containers that are called "remote instrument enclosures," or RIEs. An RIE is approximately fifteen feet tall on the outside and ten to twelve feet tall inside. (Docket Entry No. 17, Ex. B at 54). The technicians' work on the RIEs involves taking preassembled and wired large panels and wiring them into the RIEs. Technicians cannot do this work seated on a bench, but instead it requires lifting large and heavy loads, working on ceiling areas while standing on ladders, and bending and crawling to run wires, conduits, and cables through floors. (*Id*. at 84–85).

The second category of Panelmatic's work involves work on freestanding panels not intended to be placed in RIEs. (Docket Entry No. 17, Ex. B at 13). These panels ranged in

size from approximately six inches by six inches to much larger panels.  Technicians can work on the smaller panels while seated on a bench, which is where Magnant did much of his work.  (*Id.* at 32).

In 1996, when Magnant began working full-time, approximately eighty percent of Panelmatic's work was on freestanding panels of different sizes and twenty percent was on RIEs.  (Docket Entry No. 17, Ex. B at 15).  In 1998, Panelmatic's RIE market "essentially dried up," and they "didn't do very many at all."  (*Id.*).  At that time, they did primarily smaller freestanding panels.  In 2001, Panelmatic's RIE work increased substantially and the work on freestanding panels, especially smaller-sized freestanding panels declined.  (*Id.* at 16).  Leach testified that he pursued the RIE work because it gave his employees more hours.  (*Id.* at 16–17).  At the same time, the freestanding panel business that remained was mostly larger-sized panels.  Several companies that had purchased the smaller panels from Panelmatic stopped ordering them.  Leach did not pursue small-panel business because it was less profitable.  Both Magnant and Leach testified that smaller-panel work had declined and that most of the business was RIEs.  (Docket Entry No. 17, Ex. A at 113; Docket Entry No. 17, Ex. B at 16–17 ).  Both testified that in early 2004, work was generally slow.  (Docket Entry No. 17, Ex. A at 70–71; Docket Entry No. 17, Ex. B at 16–18).

Leach testified that Magnant predominantly worked on the freestanding panels, rather than the RIEs, from the very beginning of his tenure at the company.  (Docket Entry No. 17, Ex. B at 32).  Magnant asserted that he did work on RIEs in the first few years of his

employment at Panelmatic, but admitted that the last time he worked on an RIE was in July 2002.  (Docket Entry No. 17, Ex. A at 69).  Leach testified that after Magnant's knee problems worsened, Leach allowed him to do primarily bench work, which limited him to smaller panels.

> Q.     . . . . So my question is, when he started working with you, first I asked and you said that he was working minimally on remote instrument enclosures but mostly on the freestanding units, correct?
> A.     I would agree with that, yes.
> Q.     So among the—most of his work was on freestanding units, so would they be different sizes or was he working only on a particular size units?
> A.     I would have to believe they were all sizes.
> Q.     Okay.  So would that be true of the first two or three years?
> A.     That would probably be true.
> Q.     So did that change at any time after, say, in three years—say, in '99, did he not work on all kinds of sizes of instruments?
> A.     At some point in time . . . .  Ken had some physical problems, he had some knee problems.  He had to go to the doctor and get injections in his knee.  He had a real problem standing, so we moved him to doing panels we could put on benches, they were smaller ones, to accommodate the problems he was having at that time with his knees.

(Docket Entry No. 17, Ex. B at 34).

Leach testified that as Panelmatic's work changed over time to focus more on RIEs and some large freestanding panel work, with progressively less small-panel work, the work Magnant was able to perform also changed because of his health problems. In addition to his knee problems and obesity, Magnant's doctor significantly restricted his ability to lift, stand, and walk after he returned from heart surgery in December 2003.  Leach described the qualifications for a technician to perform the work available at Panelmatic at the time of

Magnant's discharge:

> [T]he requirements are they have to be able to climb up on a ladder, they have
> to be able to crawl into small spaces or underneath floors to get in panels. . .
> . Got to be able to lift things.  I mean, most everything we do is—is large.  I
> mean, some of the things we do is small, but a good portion of what we do
> weighs more than 20 pounds.

(Docket Entry No. 17, Ex. B at 85).

Magnant testified as to how he worked after he returned to Panelmatic in December 2003, following his heart surgery.  Although he did not formally ask for accommodations, Leach and others at Panelmatic knew that Magnant could not lift or pull heavy objects, could not stand for extended periods, and could not walk any distance.  Magnant testified that if he had to lift or pull something weighing over 25 pounds, he would ask for and receive help.

Many of the units put into RIEs are as big as refrigerators and require two able-bodied people to lift them into place.  (Docket Entry No. 17, Ex. B at 54).  Magnant could not help others lift heavy items and had to get someone else to lift or pull items that a single able-bodied person could handle.  In addition to the limit on lifting, Magnant's problems limited his ability to work on a ladder and reach above his head.  Leach testified that  "a lot of [work in RIEs] requires you being up on ladders . . . people up on ladders putting lights in the ceiling, that sort of thing," but Magnant could not work from a ladder on a work surface above him.  (*Id*. at 84).  Magnant testified that he could work from a stepladder, but his testimony appears to be that after his heart surgery he could not stand on a ladder for an extended period to do work above his head.  (Docket Entry No. 17, Ex. A at 63).  Nor is it

clear that a stepladder would have been sufficient for a technician to perform the work necessary on RIE ceilings or similar areas.  Because of his knees, Magnant could not crawl in small places, such as underneath the floor areas of an RIE, as necessary to install conduits and cables.  (Docket Entry No. 17, Ex. B at 75).

The record shows that after his September 2003 surgery, Magnant worked primarily on smaller panels at a bench and relied on others to lift or pull heavy loads.  The record also shows that in April 2004, Panelmatic was experiencing a slow down in work and that the small-panel work had been decreasing over time.  Leach testified that on the day he decided to lay Magnant off, there was no bench work available.  "[W]e had run out of any type of bench work that we had.  The only thing I had to do that was left to do [sic] was to run cables in an RIE.  So I asked Ken to go out there and run those cables.  After about 15 minutes he came in and said, 'Rich, you know my knees are shot.  I cannot run those cable.'  I had nothing else for him to work on at that time."  (Docket Entry No. 17, Ex. B at 36–37).

The record includes a copy of an email from Leach stating:  "As of today (4-23-04) Ken Magnant [sic] is laid off.  Please take care of change of status notification.  Note, that the reason for layoff is the inability and unwillingness of Ken to do work available, not lack of work.  We should pay him for the time he was here today."  (Docket Entry No. 17, Ex. A).  Leach testified that he laid Magnant off because he was physically unable to perform the work assigned.  Leach testified as follows:

> He cannot go up and down ladders.  In our RIEs, he can't crawl around on his knees.  A lot of the stuff we do is done underneath floors.  He cannot get down

> on his hands and knees and run the conduits on the floor.  I will not put him
> up on ladders where he could get—where he could be injured to put lights up
> on ceilings. . . . [H]e can't lift anything more than 20 pounds, I guess, still.  I
> mean, almost everything we do weighs more than 20 pounds.  Another
> restriction that I thought was temporary but I guess is permanent, he couldn't
> walk more than 75 yards.

(Docket Entry No. 17, Ex. B at 75).

        Leach and Magnant both testified that the layoff was initially characterized as
temporary.  When no call to work came, Magnant asked Leach when he would be called
back.  According to Magnant, Leach stated that he could come back when he had an
unrestricted release from his physician.  Leach testified that he "didn't have enough work
on a consistent basis to call [Magnant] back to keep him busy 40 hours a week."  (Docket
Entry No. 17, Ex. B at 41).  Magnant testified that on three occasions when he visited
Panelmatic after he lost his job, he saw employees working on small freestanding panels.
(Docket Entry No. 17, Ex. A at 72).  Leach acknowledged that Panelmatic continued to do
some work on smaller-sized freestanding panels, but that no employee did stationary bench
work on a regular basis.  (Docket Entry No. 17, Ex. B at 47–48, 94).  Leach also explained
why he was unwilling to move employees assigned to specific jobs to do different jobs to
accommodate Magnant:

> Well, I'm not going to—if a person's assigned to a job, I'm not going to pull
> this guy off and say, "You go finish this and you go over here and do that."
> That would be very inefficient.  We're in a very highly, highly competitive
> marketplace. I can't be moving people around just to accommodate somebody
> because they don't want to work or can't work doing this job.  That was the
> only thing I had available that needed done right then and there.

(*Id.* at 91).  Leach testified that he laid Magnant off because he was physically unable to perform the work that was available on a full-time basis.

The record shows that even before Magnant's discharge, Panelmatic was concerned about how the change in its work from a lot of work on freestanding panels of all sizes to primarily work on RIEs and large freestanding panels would affect Magnant, given his physical limitations.  The record includes an unsigned letter from Leach to Magnant, dated July 24, 2002, after the flare-up with Magnant's knee problems had led to him doing almost all bench work.  The letter states:

> Ken,
> I wanted to make you aware of a concern I have about the future.  In the past, we have been able to generate enough bench type wiring work to keep you busy.  Our workload seems to be changing and I am not certain I will be able to do this in the future.  As you know, RIB [Remote Instrument Box] projects have become the majority of our present work.  This work requires using ladders, working from a low position, and generally greater mobility.  I feel that asking you to do this might be a safety hazard for you.  Before putting you in a situation that might be unsafe, I would like to get an opinion from your physician on this matter.
> Again, my concern is that we may not be able to continue to obtain work that you can perform.  Obviously, your opinion in this matter is important.  Please feel free to discuss this with me.

(Docket Entry No. 17, Ex. A).  Magnant asserted that he did not receive this letter until May 5, 2004—after Panelmatic discharged him—when he went in to pick up his last paycheck. (Docket Entry No. 17, Ex. A at 78).  Leach admitted that it was possible that the letter was never given to Magnant.  (Docket Entry No. 17, Ex. B at 61–62).  Leach testified that even before Magnant's heart surgery and the additional restrictions on his ability to lift, to stand,

or to work, he met with Magnant several times to discuss the changing nature of Panelmatic's business.  Despite Magnant's desire to work in RIEs as well as at a bench, Leach was concerned that the problems with his knees and his obesity would not allow him to work safely on a ladder as required in RIEs.  (*Id.* at 86–87).

The record also includes a letter dated October 24, 2002, from Douglas Crush, Panelmatic's Human Resources Representative, to Magnant's treating physician.  (Docket Entry No. 17, Ex. A).  The letter  attaches a copy of Magnant's job description and states, "Mr. Magnant has, we feel, limited mobility.  In the past, we have not asked him to use ladders or meet some of the physical requirements of the assembly and wiring position.  To do this, we have tried to accommodate Ken by providing him with bench type work.  Our workload seems to be changing and we are not certain that we will be able to do this in the future.  Mr. Magnant has been informed of this." (*Id.*).  The attached job description states: "Ability to stand on concrete for up to 10 hours per day.  Use of ladder, bending, good vision to read tapes and prints, lifting 50 pounds.  Hand strength capable of operating manual crimping tools."  (*Id.*).  Magnant testified that Panelmatic did not provide him a copy of the job description, though he asked to see one repeatedly during the eight years he worked for Panelmatic. (Docket Entry No. 17, Ex. A at 75).

In April 2004, Magnant applied for disability benefits from the Social Security Administration.  In the application, he stated that he was unable to work because of his disability, which had begun on the date he was discharged from Panelmatic, April 23, 2004.

The record includes a "Disability Certificate" signed by Doctor Patton, dated May 5, 2004, which states that Magnant could return to work with the following limits: "No lifting > 25 lbs.   No climbing, crawling, pushing or pulling > 45 lbs.   No prolonged walking or standing."   (Docket Entry No. 17, Ex. A).   In his deposition, taken on October 21, 2005, Magnant testified that he is permanently disabled and "not able to return to work," although he might like to try office work.   (Docket Entry No. 17, Ex. A at 14–15).   Magnant remains unable to do any heavy lifting.   (*Id.* at 88–92).   He gets tired easily, cannot walk more than 75 to 100 yards without stopping, and cannot kneel.   (*Id.*).   Magnant received disability benefits from the Social Security Administration.

## II.     The Applicable Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.   *See* FED. R. CIV. P. 56.   Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).   If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an

11

essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

Affidavits supporting or opposing summary judgment must "set forth facts that would be admissible in evidence." FED. R. CIV. P. 56 (e); *see Love v. Nat'l Med. Ctr.*, 230 F.3d 765, 776 (5th Cir. 2000). "Statements constituting hearsay are not competent summary judgment evidence." *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 510 (5th Cir. 2001) (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)). Material that is

inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial.  *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Cabillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

**B.      The Americans with Disabilities Act**

"The ADA makes it unlawful for an employer to discriminate against 'a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 476 (5th Cir. 2006) (quoting 42 U.S.C. § 12112(a)).  The elements of a *prima facie* case of disability discrimination under the ADA are: (1) a disability as defined by the ADA; (2) the plaintiff is a "qualified individual" for the job; and (3) the employer made an adverse employment decision based on the disability.  *See Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999); *Robertson v. The*

*Neuromedical Ctr.*, 161 F.3d 292, 294 (5th Cir. 1998).

If the plaintiff makes a *prima facie* showing of a disability-based adverse employment action, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881 (5th Cir. 2003); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).  If the defendant meets this burden,  the plaintiff must show by a preponderance of the evidence that the proffered reasons for the challenged decision are pretextual or that disability discrimination was at least one of the motivating factors in the decision.  *Gowesky*, 321 F.3d at 511; *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000).

The question on summary judgment is whether there is a conflict in the evidence to create a jury question as to disability-based discrimination.  *See Gowesky*, 321 F.3d at 512.  If the claim reaches the pretext stage, the issue is whether the evidence, viewed in the light most favorable to the plaintiff, creates a jury question regarding the discriminatory termination claim.  *See Anderson*, 477 U.S. at 255; *Cabillo*, 288 F.3d at 725. A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).  An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action.  *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).  Evidence demonstrating that the employer's explanation

14

is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely

to support an inference of discrimination even without further evidence of defendant's true

motive. *Id.* at 897; *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000).

No further evidence of discriminatory animus is required because "once the employer's

justification has been eliminated, discrimination may well be the most likely alternative

explanation." *Reeves*, 530 U.S. at 147–48. The "rare" instances in which a showing of

pretext is insufficient to establish discrimination are (1) when the record conclusively reveals

some other, nondiscriminatory reason for the employer's decision, or (2) when the plaintiff

creates only a weak issue of fact as to whether the employer's reason was untrue, and there

was abundant and uncontroverted evidence that no discrimination occurred. *See Russell*, 235

F.3d at 223 (citing *Reeves*, 530 U.S. at 148); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218

F.3d 392, 400 (5th Cir. 2000).

Section 12112(a) of the ADA states:

> No covered entity shall discriminate against a qualified individual with a
> disability because of the disability of such individual in regard to job
> application procedures, the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms, conditions, and
> privileges of employment.

42 U.S.C. § 12112(a).

Under the ADA, a person is disabled if he "either (1) is actually disabled, (2) is

regarded as being disabled, or (3) has a record of being disabled." *Dupre v. Charter

Behavioral Health Sys.*, 242 F.3d 610, 613 (5th Cir. 2001). The ADA defines "disability"

as "a mental or physical impairment [which] must substantially limit an individual's ability

to perform at least one major life activity." *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003). Whether an individual suffers from a disability is determined on a case-by-case basis. *Albertson's, Inc. v. Kirkingberg*, 527 U.S. 555, 556 (1999). "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). Whether an impairment is substantially limiting depends on "its nature and severity, its duration or expected duration, and its permanent or expected permanent or long-term impact." *Dupre*, 242 F.3d at 614; *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004). "'Temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities.'" *Bennett v. Calabrian Chems. Corp.*, 324 F. Supp. 2d 815, 827 (E.D. Tex. 2004) (quoting *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998)). Major life activities include "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Bennett*, 324 F. Supp. 2d at 826 (quoting *Talk*, 165 F.3d at 1024–25). "[A] plaintiff must prove a substantial limit with specific evidence that *his particular* impairment substantially limits *his particular* major life activity." *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 656 (5th Cir. 2003).

A "qualified individual" is "one who is able to meet all of the program's requirements in spite of his handicap." *Burden v. Sw. Bell Tel. Co., L.P.*, No. 05-11292, 2006 WL 1342709 (5th Cir. May 16, 2006) (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)). The ADA defines a "qualified individual with a disability" as an individual who "with or without reasonable accommodation, can perform the essential

16

functions of the employment position that such individual holds or desires." 42 U.S.C.

§ 12111(8). "To avoid summary judgment on whether he is a qualified individual, [a

plaintiff] must show (1) that he could perform the essential functions of the job in spite of his

disability or (2) that a reasonable accommodation of his disability would have enabled him

to perform the essential functions of his job." *Turco*, 101 F.3d at 1093.

> Section 12112(b)(5)(A) states that discrimination includes:

> [N]ot making reasonable accommodations to the known physical or mental
> limitations of an otherwise qualified individual with a disability who is an
> applicant or employee, unless such covered entity can demonstrate that the
> accommodation would impose an undue hardship on the operation of the
> business of such covered entity . . . .

42 U.S.C. § 12112(b)(5)(A). The Fifth Circuit has stated that "[i]n general . . . it is the

responsibility of the individual with the disability to inform the employer that an

accommodation is needed." *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.

1996) (quoting 29 C.F.R. § 1630.9, App. (1995)); *see also Cutrera v. Bd. of Supervisors of

La. State Univ.*, 429 F.3d 108, 112–13 (5th Cir. 2005). Once such a request has been made,

"[t]he appropriate reasonable accommodation is best determined through a flexible,

interactive process that involves both the employer and the qualified individual with a

disability." *Taylor*, 93 F.3d at 165 (quoting 29 C.F.R. § 1630.9, App. (1995)). The

employee's initial request for an accommodation triggers the employer's obligation to

participate in the interactive process of determining one. *Id.* at 165; *Cutrera*, 429 F.3d at

112. A "reasonable accommodation" may include "job restructuring, part-time or modified

work schedules, reassignment to a vacant position," and general concessions involving

training and facilities.  42 U.S.C. § 12111(9).

C.    The Age Discrimination in Employment Act

The elements of the *prima facie* age discrimination wrongful termination case are: (1) the plaintiff was discharged; (2) he was qualified for the position at issue; (3) he was within the protected class; and (4) he was replaced by someone younger or outside the protected group, or treated less favorably than similarly situated younger employees. *Smith v. Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003), *aff'd on other grounds*, 544 U.S. 228 (2005); *Brown v. CSC Logic, Inc*., 82 F.3d 651, 654 (5th Cir. 1996).  A *prima facie* case creates a presumption that the employer unlawfully discriminated against the plaintiff.  *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999).  The defendant must proffer a legitimate, nondiscriminatory reason for the challenged employment decision.  *Russell*, 235 F.3d at 222; *Bauer*, 169 F.3d at 966.  "This burden on the employer is one only of production, not persuasion, involving no credibility assessments."  *Russell*, 235 F.3d at 222; *see Bauer*, 169 F.3d at 966 ("The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *'if believed by the trier of fact,'* would support a finding that unlawful discrimination was not the cause of the employment action." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993))).  If the defendant meets its burden, the presumption of discrimination created by the *prima facie* case disappears, and the plaintiff is left with the ultimate burden of proving discrimination.  *Hicks*, 509 U.S. at 511–12.  The plaintiff may meet its ultimate burden with evidence tending to show that the reason offered by the defendant is a pretext for discrimination.  *McDonnell Douglas Corp.*

18

*v. Green*, 411 U.S. 792, 804 (1973).  Alternatively, the plaintiff may show that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative).  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).  If a plaintiff demonstrates that age was a motivating factor in the employment decision, the defendant then must prove that the same adverse employment decision would have been made regardless of discriminatory animus.  If the employer fails to carry this burden, the plaintiff prevails.  *Id.*

## III.   Analysis

### A.    The ADA Claim

#### 1.    A Disability

Panelmatic argues that Magnant cannot make a *prima facie* showing that he has a disability. (Docket Entry No. 16 at 22).  Magnant contends that he is disabled by his obesity and his heart condition.  (Docket Entry No. 22 at 15).  In his affidavit and his deposition, Magnant stated that he has difficulty performing tasks that require him to lift objects heavier than 25 pounds or to walk more than 50–75 yards or to stand for an extended period.  The ADA defines disability as a substantial limitation of one or more major life activities, which include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Bennett*, 324 F. Supp. 2d at 826 (quoting *Talk*, 165 F.3d at 1024–25).  Major life activities under the ADA may also include lifting, reaching, sitting, or standing.  *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996)

19

(citing *Dutcher*, 53 F.3d at 726 n.7).  Magnant has made a *prima facie* showing that he has a disability because his impairments, including the permanent affects of his heart condition and surgery, his knee problems, and his obesity, substantially limit his ability to lift, stand, and walk.  *Id.*; *Dupre*, 242 F.3d at 614; *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758–59 (5th Cir. 1996).

### 2.    *A Qualified Individual and a Reasonable Accommodation*

Panelmatic also argues that Magnant cannot make a *prima facie* showing that he is qualified for the job he held at the company.  (Docket Entry No. 16 at 19).  This element of the  *prima facie* case requires that the plaintiff be able to perform the essential functions of his job with or without reasonable accommodations.  *Robertson*, 161 F.3d at 294–95; *Vitale v. Ga. Gulf Corp.*, 82 Fed. Appx. 873, 875 (5th Cir. 2003).  Undisputed evidence in the summary judgment record shows that Magnant was not able to perform the essential functions of his job as an electrical technician at Panelmatic after he returned from heart surgery in December 2003, even with reasonable accommodations.

Magnant does not argue that he could perform the job he held without accommodations.  Instead, he argues that Panelmatic was required to accommodate his inability to lift, to kneel, to walk more than 100 yards, and to stand for extended periods by allowing him to work on bench jobs and to avoid lifting or pulling objects weighing more than 25 or 30 pounds.

Panelmatic argues that Magnant never requested such accommodations, (Docket

20

Entry No. 16 at 6–7), but the record shows that Leach was aware of the medical restrictions on Magnant's work when he returned from surgery in December 2003.  As time passed, Leach became aware that the restrictions were permanent.  The record also shows that both before the heart surgery, when Magnant injured his knees in a fall, and after the heart surgery, Leach and others at Panelmatic did accommodate his limitations by allowing him to do bench work and avoid any heavy lifting.  The Fifth Circuit has stated that if a disability is not "open, obvious, and apparent to the employer . . . the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Taylor*, 93 F.3d at 165.  Here, Panelmatic received the doctor's Return to Work Note, stating that Magnant should not lift anything greater than twenty pounds and should not walk distances greater than seventy-five yards.  (Docket Entry No. 17, Ex. A).  Leach testified that he was aware of these restrictions.  (Docket Entry No. 17, Ex. B at 75).  Panelmatic's argument that as a matter of law, Magnant did not request any accommodation, is unpersuasive.[1]

The term "essential function" means those duties that are fundamental to the job in question.  29 C.F.R. § 1630.2(n)(1).  It does not include the marginal functions of the position.  *Id.*  "In determining what constitutes the essential functions of a position, 'consideration shall be given to the employer's judgment as to what functions of a job are

---

[1] Because a fact issue exists as to whether the medically imposed work restrictions served as a request for reasonable accommodations, this court need not consider the issue of whether Magnant's affidavit in response to Panelmatic's  summary judgment motion contradicts his earlier deposition testimony.  (Docket Entry No. 23 at 4–7).

essential . . . .'" *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 486 (5th Cir. 2001) (quoting 42 U.S.C. § 12111(8)).  Other relevant factors include the amount of time spent on the job performing the function and the consequences of not requiring the employee to perform the function. 29 C.F.R. § 1630.2(n)(3). Based on the undisputed evidence in the summary judgment record, this court finds the ability to lift and pull heavy objects and to work while standing on ladders for extended periods were essential to an electrical technician's job at Panelmatic when Magnant was discharged.

It is undisputed that Magnant cannot lift or pull objects weighing more than 25 to 30 pounds, cannot kneel, cannot stand for extended periods, and cannot walk for more than 75 to 100 yards without stopping to rest.  Magnant contends that these restrictions do not make him unable to perform the essential functions of the electrical technician job because he can receive help to lift or pull heavy objects and can work at a bench or on tasks that allow him to sit when he needs to, can avoid crawling or kneeling, and can avoid prolonged walking. Panelmatic responds that such work is not consistently available and has not been for an extended period.

The undisputed evidence in the summary judgment record shows that Panelmatic's work from late 2003 to the present is primarily RIEs.  This work cannot be done at a bench and requires frequent and heavy lifting, extensive use of ladders, and crawling underneath floor spaces.  Panelmatic has some work on freestanding panels, but the size of most of the panels means that the work cannot be done at a bench and requires frequent heavy lifting.

22

The evidence in the summary judgment record shows that the work of a technician at Panelmatic during this period requires the ability to lift and pull heavy objects, to work on ladders to reach overhead work surfaces, and to crawl underneath floor spaces.

At Leach's deposition, Magnant's counsel asked, "If I have to ask you, sir, what is the essential job function for a technician at your shop, how would you describe it?" (Docket Entry No. 17, Ex. B at 84).  Leach replied that a technician must be able to climb up ladders, crawl into small spaces, and lift objects weighing over twenty pounds.  (*Id.* 84–85).  Leach later testified that not requiring a technician to do the climbing, crawling, and heavy lifting required for the job would require interrupting workers assigned to specific tasks, produce inefficiencies, and hamper production in a highly competitive industry.  (*Id.* at 91).  Magnant claims that heavy lifting was not an essential element of the technician job.  In support, Magnant provides only an earlier excerpt from Leach's deposition testimony, in which Magnant's counsel asked, "What is a technician supposed to know in order—can I do the technician work?" and "[W]hen you hire a technician, what do you require?"  (Docket Entry No. 17, Ex. B at 20–21).  Leach replied,

> A lot of—a lot of our technicians in the past virtually didn't know nothing when they walked through the doors.  We trained them—we trained them and everything.  What they needed to know was when we hired them, one, they had to be physically able to do the job that—but mainly could they add and subtract fractions.  I mean, we have a various set of tests.  Could they add and subtract fractions; can they measure things with a tape measure. . . . Can they run a drill motor; can they, you know, do physical things like that.  Are they mechanically inclined; can they see things three dimensionally; can they work quickly with their hands.

*Id.*  Magnant argues that Leach's failure specifically to name "heavy lifting" as an essential

23

job function creates a genuine issue of disputed fact material to deciding whether heavy lifting was an essential job function.  The record does not support this conclusion.  Leach was asked two different questions.  "What is a technician supposed to know in order—can I do the technician work?" and "[W]hen you hire a technician, what do you require?"  (*Id.* at 20–21).  Counsel later asked, "I may have asked this to you in certain ways, but I don't think I got a clear answer.  If I have to ask you, sir, what is the essential job function for a technician at your shop, how would you describe it?"  (*Id.* at 84).  Any discrepancy in Leach's testimony comes from the variations in counsel's questions.  Counsel for Magnant prefaced the second question with a request for clarification of the job's essential functions.  Leach testified that heavy lifting, crawling, and climbing were essential functions.  (*Id.*).  This testimony in context would not support an inference that heavy lifting, climbing, and crawling were not essential job requirements.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).  This testimony does not create a disputed fact issue.

Magnant admits that he is unable to meet these physical requirements.  (Docket Entry No. 17, Ex. A at 101; Docket Entry No. 1, ¶ 5).  A reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii).  "Reasonable accommodation is an element of a *prima facie* case of

discrimination under the ADA, § 12111(8), and [the plaintiff] thus bears the burden of proof of reasonableness." *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996).

Magnant contends that as a reasonable accommodation, Panelmatic should have reassigned him to light-duty jobs that he could do in a seated or stationary position and that would not require heavy lifting. The testimony is, however, undisputed that from April 2004 to the present, Panelmatic had no full-time "light-duty" positions and did not have enough bench work to keep a full-time employee occupied. (Docket Entry No. 17, Ex. B at 41). Magnant's testimony that he saw a few employees doing bench work when he visited Panelmatic after he was laid off does not raise a fact issue as to reasonable accommodation. Leach explained that there was some small-sized freestanding panel work to be done, but not on a consistent basis and not enough to keep a full-time worker busy. Even if some workers did have some work that could be done at a bench rather than on a ladder, in an RIE, or under a crawl space, the ADA does not require Panelmatic to take all such work away from other employees and reassign it to Magnant. Leach testified that interrupting workers to reassign work was inefficient and resulted in a loss of production. Leach testified that on the day he laid Magnant off, there was no bench work or light-duty work available to give him without taking it away from other people. Leach also testified that he did not have enough light-duty work to keep Magnant busy on a full-time basis. Leach testified that he did not call Magnant to return to work because he did not have bench or light-duty work on a consistent, full-time basis. Magnant does not identify or provide evidence that disputes

25

Leach's testimony that after April 2004, Panelmatic "didn't have enough work on a consistent basis to call him back to keep him busy 40 hours a week." (Docket Entry No. 17, Ex. B at 41).

Under the ADA, the court may consider reassignment to a vacant position as a reasonable accommodation. *Daugherty v. City of El Paso*, 56 F.3d 695, 698 (5th Cir. 1995) (citing 42 U.S.C. § 12111(9)). But the ADA does not require an employer to reassign a disabled employee to an occupied position or create a new position to accommodate that employee. *Id.* at 700. Magnant provides no evidence that Panelmatic had a full-time vacant position to do only bench work or light-duty work that would have accommodated his restrictions. *See Vitale v. Ga. Gulf Corp.*, 82 Fed. Appx. 873, 875 (5th Cir. 2003). To the contrary, the undisputed evidence is that Panelmatic's supply of small-size freestanding panel work—the type that can be performed while sitting on a bench—had progressively dwindled over the years. "Under the ADA, an employer is not required to give what it does not have." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997). "Changing movant from a laborer to a 'light-duty' worker is not a reasonable accommodation to assist in the performance of his job; it is a completely different job." *Johnson v. City of Port Arthur*, 892 F. Supp. 835, 842 (E.D. Tex. 1995); *see also Turco*, 101 F.3d at 1094 (holding that employer is not required to create light-duty jobs to accommodate disabled employees). Panelmatic had no obligation to reassign Magnant to a light-duty position or to create one for him.

Magnant argues that he should have been allowed to avoid heavy lifting by asking other employees to help when necessary. (Docket Entry No. 22 at 7). Magnant testified that

26

it was common practice for technicians to help one another when the job involved heavy lifting. (Docket Entry No. 22, Ex. C). But the record shows that Magnant had to ask other employees for help when the load involved could be lifted by a single able-bodied worker. The record shows that Panelmatic allowed Magnant to work at a bench and to rely on other employees to lift heavy loads for him after his surgery. Those restrictions turned out to be permanent, not temporary. Panelmatic was not obligated to restructure Magnant's job as technician permanently to eliminate heavy lifting, crawling, and kneeling. The ADA does not require employers to modify the duties of other employees in order to provide a reasonable accommodation. An employer is not required to eliminate or reallocate essential functions of a position in order to provide accommodation. *See Bradley v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 925 (5th Cir. 1993) (holding that "such redefinition exceeds reasonable accommodation").

The facts of this case are similar to those involved in *Herrera v. CTS Corporation*, 183 F. Supp. 2d 921 (S.D. Tex. 2002). In that case, as in the present case, the employee argued that their postsurgery jobs should be modified to make them responsible for lifting loads that did not weigh more than a specified amount. That modification required a determination of how much a particular item weighed and, if it weighed more than the amount the employee could lift, to have another employee lift, place, or pull it. The court in *Herrera* quoted the Fifth Circuit opinion in *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702 (5th Cir. 1997), which stated:

> [T]he law does not require an employer to transfer from the disabled employee any of the essential functions of his job. If it is necessary to transfer any of the essential functions of [the] job to others[,] the [plaintiff] is not otherwise qualified. We cannot say that he can perform the essential functions of the job with reasonable accommodation if the only successful accommodation is for [the plaintiff] not to perform these essential functions.

*Barber*, 130 F.3d at 709.  In *Herrera*, the court concluded that by restructuring the shipping clerk's position so that the employee would be responsible only for handling cartons that weigh less than a certain amount, the employer would be "reallocating the essential functions of the Shipping Clerk's job to other employees. This is beyond what the ADA requires." 183 F. Supp. 2d at 930.  "'It is not reasonable to require an employer to have two people doing one person's job in the name of accommodation. Assistance is one thing, but performing a significant portion of the essential functions of another person's job is another thing altogether.'"  *Id.* (quoting *Hershey v. Praxair, Inc.*, 969 F. Supp. 429, 435 (S.D. Tex. 1997)).

The ADA does not require an accommodation that would result in other employees working harder or longer hours.  29 C.F.R. § 1630.2(p)(2)(v); *Robertson*, 161 F.3d at 295; *Foreman*, 117 F.3d at 809–10*; Turco*, 101 F.3d at 1094.

The fact that Panelmatic had made a previous accommodation to Magnant in providing some light-duty work and allowing other technicians to assist in heavy lifting does not establish the reasonableness of that accommodation or that Panelmatic was required to continue that accommodation indefinitely.  *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) (holding that employer is not required to continue to provide

28

unreasonable accommodations).   In *Holbrook*, the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of a police department on the plaintiff's ADA claim.  *Id.* at 1525.  Although the department had provided accommodations for the visually impaired Holbrook for nearly four years before the lawsuit, the court held that Holbrook's requested accommodations were unreasonable and the department legally could stop providing them.  *Id.* at 1528.  Similarly, the fact that Panelmatic allowed Magnant to work at a bench for an extended period and to avoid crawling or kneeling—while bench work was available on a full-time basis—and allowed him to avoiding heavy lifting when he returned from his surgery, does not require Panelmatic to continue to do so indefinitely.

Magnant has failed to raise a fact issue material to deciding whether he could perform the essential functions of his job.  As a matter of law, he was not a qualified individual when he was laid off.  Magnant has also failed to raise a fact issue as to whether the ADA requires a reasonable accommodation that was denied.[2]

### 3.   The Relationship to Disability for Social Security Benefits

Panelmatic also argues that Magnant cannot reconcile his claim of permanent disability for the purpose of obtaining Social Security disability insurance benefits with the ADA requirements.

---

[2] Magnant's testimony that Fernando Renteria, the foreman at Panelmatic, told Magnant that he was among five people Leach had said that he wanted "to get rid of" does not raise a fact issue as to disability discrimination.  Magnant has not met the *prima facie* elements of his disability discrimination claim.  Second, Panelmatic does not dispute that it had long-standing concerns about Magnant's ability to do the work necessary for his job, given the changes in the work mix that lessened the amount of bench work available.

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim.   To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807 (1999).  A court must first consider whether the two statements are factually inconsistent.  Second, the court is to determine whether the proffered explanation of the inconsistency warrants a reasonable conclusion that the plaintiff could nonetheless perform the essential functions of the job with or without reasonable accommodations.  *Id.*; *see also McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 464 (5th Cir. 2005).

Magnant stated he was "permanently disabled" as of April 24, 2004, the date he was laid off from his job at Panelmatic.  But in his complaint asserting an ADA claim, Magnant states that he is able to perform the essential functions of his job with reasonable accommodations.  These two statements are factually inconsistent.

*Cleveland* next requires that the ADA plaintiff explain how the contention of disability for Social Security benefit application purposes  is consistent with the contention of continued ability to perform the job with reasonable accommodations for ADA purposes.  *Cleveland*, 526 U.S. at 798.  Magnant explains the two positions by pointing to the definitional difference between the Social Security disability benefits "permanently disabled" requirement and the ADA "qualified individual" requirement.  (Docket Entry No.

30

22 at 11).  He states that the Social Security Act definition of disability does not take into account the effects a reasonable accommodation would have on his ability to work.  (*Id.* (citing *Cleveland*, 526 U.S. at 807)).

The record shows that, as a matter of law, Magnant's disability prevented him from performing the essential functions of his job at Panelmatic and that no reasonable accommodation would enable him to perform those functions.  Additionally, Magnant testified in his deposition in this case that he still has the same impairments he had when Panelmatic laid him off; those impairments are permanent; and that, as a result, he remains permanently disabled and is unable to return to work at any type of job except perhaps in an office (which he has never done).  (Docket Entry No. 17, Ex. A at 12–15).  Magnant's explanation of the discrepancy between the Social Security benefits implication and ADA claims is, as a matter of law, insufficient "to warrant a reasonable juror's concluding that . . . [Magnant] could nonetheless 'perform the essential functions' of [his] job, with or without 'reasonable accommodation.'"  *Cleveland*, 526 U.S. at 807 (internal citations omitted).[3]

Because Magnant fails to establish a fact issue material to whether he is a "qualified

---

[3] Magnant did not assert a cause of action for retaliation under the ADA.  The statute makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Magnant cites Leach's testimony that he decided that Magnant would not be coming back to work at Panelmatic "[w]hen he filed his EEOC claim" in September 2004.  (Docket Entry No. 22 at 19).  Leach testified that both before and after this date, Panelmatic did not have work available that Magnant was physically capable of doing on a full-time basis.

31

individual" under the ADA, Panelmatic is entitled to judgment as a matter of law. Panelmatic's summary judgment motion as to Magnant's claim for disability discrimination is granted.

### B.    The Age Discrimination Claim

Magnant was fifty-five years old when he was laid off and  experienced an adverse employment action.  He was not, however, physically qualified for the technician position. Magnant has not pointed to evidence tending to show that Panelmatic replaced him with a younger employee or treated him less favorably than similarly situated younger employees. *Smith*, 351 F.3d at 196.

The record does not disclose a fact issue as to whether Panelmatic's termination decision was a pretext for discrimination on the basis of age.  Panelmatic argues that its decision to discharge Magnant was not related to his age, but was because Magnant could not perform the work required.  (Docket Entry No. 16 at 25).  Magnant testified in his deposition that he believed other employees, who were younger or had less seniority, had received higher pay in the past.  (Docket Entry No. 17, Ex. A at 34).  Leach explained that pay rates were not based on seniority, but rather on the speed of performing work.  Magnant identifies no evidence that contravenes Leach's explanation.  And Magnant identifies no evidence that Panelmatic's decision to lay him off was based on age as opposed to disability.  (Docket Entry No. 22 at 17–20).  Because there is no disputed fact issue material to determining whether Panelmatic's decision to lay Magnant off was a pretext for age

discrimination, Panelmatic's summary judgment motion as to Magnant's age discrimination claim is granted.

**IV.     Conclusion**

Panelmatic's summary judgment motion is granted.  Final judgment will be entered by separate order.

SIGNED on August 22, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge